UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1255(DSD/SRN)

Spectronix Ltd., an Israeli corporation,

Plaintiff,

v.

**ORDER**

Detector Electronics Corporation, suing as Detector Electronics, a Minnesota corporation,

Defendant.

Malcolm L. Moore, Esq. and Moore & Hansen, 3000 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402 and Randall T. Skaar, Esq., Bradley D. Pedersen, Eric H. Chadwick, Esq., Scott G. Ulbrich, Esq. and Patterson Thuente, Skaar & Christensen, 4800 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiff.

Albert L. Underhill, Esq., Paul E. Lacy, Esq., John M. Berns, Esq., Joshua N. Randall, Esq. and Merchant & Gould, 80 South Eighth Street, Suite 3200, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court for claim construction of four patents-in-suit: United States Patent No. 5,373,159 ("the '159 patent"), United States Patent No. 4,639,598 ("the '598 patent"), United States Patent No. 4,776,775 ("the '775 patent") and United States Patent No. 4,679,156 ("the '156 patent"). Based on a review of the file, record and proceedings herein, and for the reasons stated:

FILED
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ______
Deputy Clerk's Initials ______

1. The court construes the relevant terms of the '159 patent as follows:

a. The term "includes" in the phrase "wherein said third sensor senses radiation over a broad band which includes the two bands of said first and second sensors" requires that the third sensor senses all of the bands of the other two.

b. The term "$CO_2$ emission band" does not require construction.

2. The court construes the relevant terms of the '775 patent as follows:

a. The phrase "detector means" in the clause "at least one detector means for detecting electromagnetic energy and generating a detector signal responsive to the amplitude of the detected energy" requires a detector and means for generating a signal in response to the amplitude of the energy detected.

b. The phrase "microprocessor means" in the clause "microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in the particular detector signal" refers to a microprocessor that analyzes signals and generates an output that is dependent upon the particular predetermined patterns utilized.

c. The phrase "predetermined pattern" in the clause "microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in the particular detector signal" means a predetermined temporal variation of the signal that would be indicative of a baseline fire.

d. The phrase "means for controlling the gain of each amplifier" requires a means for controlling gain as a central processing unit ("CPU") programmed to reduce gain when the amplified detector signal exceeds the microprocessor input signal range and compensates for the reduction by application of a scale factor.

e. The phrase "means for stimulating each detector" refers to a CPU programmed to command an output demultiplexer to stimulate each detector with at least one test stimuli via a feedback line to periodically and automatically perform a self-check routine by simulating a fire condition, which program includes a provision to prevent its initiation as a real fire is developing.

f. The phrase "diagnostic means within the microprocessor means for performing a diagnostic check routine" requires that the microprocessor is capable of performing a diagnostic check.

g. The phrase "selectively releasable source of fire suppressant" requires a source of fire suppressant that is selectively released.

h. The phrase "fire suppressant" requires a physical agent that tends to suppress or reduce the intensity of fire.

i. The phrase "first coupling means" in the clause "first coupling means for coupling the first detector means to an input of the microprocessor means" requires a first coupling that couples the first detector input of the microprocessor.

j. The phrase "second coupling means" in the phrase "second coupling means for coupling an output of the microprocessor" requires a second coupling that couples an output of the microprocessor to a source of the fire suppressant.

k. The phrase "preprogrammed characteristics indicative of a serious fire" in the clause "said memory having a program stored therein for causing said CPU to analyze the output signal from the first detector means and generate a command to said source causing said fire suppressant to be released when the detector signal exhibits preprogrammed characteristics indicative of serious fire" requires that the memory include a program

that causes the CPU to analyze output from the first detector and generate a command for the release of fire suppressant when preprogrammed characteristics indicate a fire.

3. The court construes the relevant terms of the '156 patent as follows:

a. The phrase "first detector" in the clause "a first detector for generating electrical signals in response to incident radiation within a predetermined first spectral band" means that a first detector generates electrical signals in response to radiation within a certain spectral range.

b. The phrase "second detector" in the clause "a second detector for generating electrical signals from incident radiation within a predetermined second spectral band" means that a second detector generates electrical signals from radiation within another spectral region.

c. The phrase "means within the microprocessor" requires the algorithm illustrated in Figure 3 of the patent and denoted in footnote 9 as steps 3-7 and 11.

d. The phrase "preselected threshold" requires a threshold value that has been preselected and sorted in the memory of the computer and is able to determine the presence of a fire.

e. The phrase "means controllable by the microprocessor for testing the operating condition of the system at predetermined regular intervals" requires the algorithm illustrated in Figure 3 of the patent and denoted as steps 0 and 12-19 in footnote 10.

f. The phrase "means for inhibiting the generation of a fire suppressant release signal" requires the algorithm illustrated in Figure 3 of the patent and denoted as steps 8-10 in footnote 11.

g. The phrase "means for causing the microprocessor to perform a self-analysis" requires an external input device connected to the microprocessor that enables manual initiation of a test routine.

h. The phrase "fire suppressant" requires a physical agent that tends to suppress or reduce the intensity of fire.

4. The court construes the relevant terms of the '598 patent as follows:

a. The phrases "long wavelength" and "short wavelength" in the clause "first and second parallel signal channels for responding to long wavelength and short wavelength radiation, respectively" require two channels that simultaneously respond, with the first

responding to shorter wavelengths and the second responding to longer wavelengths of radiation.

b. The phrase "means coupled to the output of said multiplier stage" requires a summer that sums data as depicted by the circuit in Figure 1.

c. The phrase "storage means for temporarily storing individual products of pairs of sampled signals" requires a memory storage for use in developing the cross-correlation.

d. The phrase "first detector" requires that the first detector will not respond to a signal that is below approximately 4.0 microns, but will respond otherwise.

e. The phrase "second detector" requires that the second detector will not respond to a signal that is above approximately 4.0 microns, but will respond otherwise.

f. The phrase "means for cross-correlating sampled signals" requires a cross-correlator that develops a fire sense signal only when the signal pairs exceed a predetermined fixed or variable threshold level by comparing signal polarity, first derivative, second derivative, signal ration and other signal properties to insure that both detector signals are responding to the same source.

## BACKGROUND

Both parties are engaged in the manufacture and sale of fire sensors. Plaintiff, Spectronix Ltd. ("Spectronix"), is the owner of the '159 patent. Defendant, Detector Electronics ("Detector"), is the owner of the '598 patent, the '775 patent and the '156 patent. The parties bring the present proceeding pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 387 (1996), requesting the court to interpret the disputed claim elements of the four patents-in-suit.

The fire sensors manufactured and sold by each party are more sophisticated than standard home smoke detectors. These fire sensors are often used in dangerous conditions, such as on oil rigs or aeronautical facilities. Under such circumstances it is extremely important to detect and suppress a fire. It is equally important to minimize "false alarms." The four patents-in-suit aim to maximize detection while minimizing false alarms.

**I. The '159 Patent**

The '159 patent, entitled "Method for Detecting a Fire Condition," has 17 claims. Claim 1 claims the use of multiple sensors to detect radiation within certain bandwidths in order to indicate a fire condition. A first sensor detects radiation within a bandwidth "which includes the $CO_2$ emission band." (Anderson Aff., Ex.'159, col. 6, l. 63.) A second sensor detects radiation within a bandwidth "which includes wavelengths mainly lower than

the $CO_2$ emission band." (Anderson Aff., Ex '159, col. 6, ll. 65-66.) A third sensor detects radiation within a bandwidth "which includes wavelengths higher than the $CO_2$ emission band." (Anderson Aff., Ex. '159, col. 6, l. 68 - Col. 7, l. 1.) In addition, the third sensor "senses radiation over a broad band which includes the two bands of [the] first and second sensors." (Anderson Aff., Ex. '159, col. 7, ll. 2-3.) Spectronix asserts that the terms "$CO_2$ emission band" and "includes" require construction. (Pl. '159 Patent Br. at 1.) While Detector argues that the term "$CO_2$ emission band" does not require construction, Detector agrees that the term "includes" must be construed. (Def. '159 Patent Br. at 2-3.)

**II. The '598, '775, and '156 Patents**

As stated, Detectors owns the '598,'775 and '156 patents. Each of those patents requires that the fire sensors incorporate the use of signals from two individual detectors, each detecting a different band of electromagnetic radiation. (Def. '598 patent Br. at 1.) The '598 patent relates to "a cross-correlation fire sensor circuit that can be incorporated into fire sensors." (Id.) The '775 patent relates to a microprocessor-controlled fire sensor, and the '156 patent, a continuation-in-part of the '775 patent, also relates to a microprocessor-controlled fire sensor. (Id.)

Detector requests the court to interpret claims 1-7 of the '598 Patent. (See Def. '598 Patent Br.) Detector also requests

the court to interpret claims 1, 2, 4, 8, 11, 13, 14 and 15 of the '775 patent and claims 1, 7, 8 and 9 of the '156 Patent. (See Def. '775 and '156 Patent Br.) Spectronix argues that the court need not define each and every claim limitation of those patents and instead requests the court to construe a more limited number of terms, conceding that the rest of the terms have their ordinary meanings. (Pl. '775, '156 and '598 Patent Br. at 1-2.)

The parties now come before the court for a Markman determination. Based on a review of the file, record and proceedings herein, and for the reasons stated, the court construes the disputed terms as discussed below.

**I. The Law of Claim Construction**

Claim construction involves ascertaining the true meaning and scope of each claim as a matter of law. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 386 (1996). "Claims are normally construed as they would be by those of ordinary skill in the art." Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1571 (Fed. Cir. 1983); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.").

In determining the meaning of the terms of a claim, the court considers "intrinsic" evidence, which consists of the language of the claims, the specification of the patent and the prosecution

history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the meaning of the claim terms is unambiguous and can be determined from the intrinsic evidence, the court need not rely on extrinsic evidence in rendering its claim construction. See id. at 1583.

**A. Intrinsic Evidence**

In its analysis of intrinsic evidence, the court first must examine the language of the claims, then evaluate the specification of the patent and finally consider the prosecution history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-89 (Fed. Cir. 1996); Markman, 52 F.3d at 979-81.

**1. The Claim**

Because a patent claim defines the scope of the right to exclude, claim construction "'begins and ends in all cases with the actual words of the claim.'" SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1344 (Fed. Cir. 2001)(quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998)). Courts should give the words of a claim their ordinary and accustomed meaning. Vitronics, 90 F.3d at 1582; Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d 1270 (Fed. Cir. 1995); Gentex Corp. v. Donnelly Corp., 69 F.3d 527, 530 (Fed. Cir. 1995); ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1579 (Fed. Cir. 1988). However, "a patentee may choose to be his own lexicographer and use terms in a manner other than their

ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." Vitronics, 90 F.3d at 1582.

### 2. Specification

"Claims must be read in view of the specification, of which they are a part." Markman, 52 F.3d at 979. The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claim." Id. at 979; Autogiro Co. v. United States, 384 F.2d 391, 397-398 (Ct. Cl. 1967)("the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification .... The use of the specification as a concordance for the claim is accepted by almost every court, and is a basic concept of patent law."). "However, claims are not to be interpreted by adding limitations appearing only in the specification." Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994).

### 3. The Prosecution History

The prosecution history also provide relevant information about the scope and meaning of the claim. Id.; Markman, 52 F.3d at 980. "Arguments and amendments made during the prosecution of the patent application and other aspects of the prosecution history ... must be examined to determine the meaning of the terms in the claims." Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570,

1576 (Fed. Cir. 1995). One way the prosecution history can aid in the interpretation of a claim is by excluding an interpretation that was disclaimed during the prosecution. Id.

**B. Extrinsic Evidence**

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. In its discretion, a court may receive extrinsic evidence in order to aid the court's understanding of the patent. Id. However, when an analysis of intrinsic evidence alone will resolve any genuine ambiguity in disputed claim terms, it is improper for the court to rely on extrinsic evidence. Vitronics, 90 F.3d at 1582; Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323 (Fed. Cir. 2001); Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys., 132 F.3d 701 (Fed. Cir. 1997). Moreover, extrinsic evidence cannot be used for the purpose of varying or contradicting the terms of the claims. Markman, 52 F.3d at 981.

**C. Time Frame for Construction**

The time frame for construing claims should be the filing date of the application of the patents or the date of their amendment. See Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 760 (Fed. Cir. 1984)("The terms of the claims are best construed in light of the specification and the circumstances which surrounded the patent at its inception."); W.L. Gore & Assocs., Inc. v. Garlock, Inc.,

721 F.2d 1540, 1556 (Fed. Cir. 1983)(stating that the patent-in-suit "speaks as of the application filing date, not as of the time of trial"); Quantum Corp. v. Rodime PLC, 851 F. Supp. 1382, 1385 (D. Minn. 1994)("the meaning which the inventor gives to his words can not be made to depend upon subsequent events, but should appear when the application is filed."; Waterloo Furniture Components, Ltd. v. Haworth, Inc., 798 F. Supp. 489, 494 n. 4 (N.D. Ill. 1992)("The critical time period of claim interpretation is the filing date of their amendment, not the trial date.").

## II. The Disputed Claim Terms and Their Interpretations

The court construes the disputed claim terms in the four patents-in-suit.[1]

[1] Accordingly, in the '159 patent, the court will address the terms "$CO_2$ emission band" and "includes." With respect to the '775 patent, the court will construe the terms "detector means," "microprocessor means," "predetermined patterns," "means (for controlling the gain of each amplifier)," "means (for stimulating each detector)," "diagnostic means," "selectively releasable source of fire suppressant," "fire suppressant," "first coupling means," "second coupling means" and "preprogrammed characteristics indicative of a serious fire." The court also will construe the following terms in the '156 patent: "first detector," "second detector," "means within the microprocessor (for comparing the signals with at least one preselected threshold stored in the memory, with said means generating an output signal for initiating release of fire suppressant...)," "preselected threshold," "means controllable by the microprocessor, (for testing the operating condition of the system at predetermined regular intervals)," "means (for inhibiting the generation of a fire suppressant release signal)," "means (for causing the microprocessor to perform a self-analysis)" and "fire suppressant." Further, the court will construe the following terms of the '598 patent: "means coupled to the output of said multiplier stage," "storage means," "long wavelength," "short wavelength," "first detector," "second detector" and "means (for cross-correlating sampled signals)."

**A. The '159 Patent**

The parties dispute the meaning of the term "includes" in the phrase "third sensor senses radiation over a broad band which includes the two bands of said first and second sensors," (Anderson Aff., Ex. '159, col. 7, ll. 1-3), and the meaning of the term "$CO_2$ emission band."[2] Based upon a careful review of the file, record and proceedings herein, the court construes the term "includes" to mean that "the third sensor senses all of the bands of the other two" and therefore finds that construction of the term "$CO_2$ emission band" is unnecessary.

Claim 1 of the '159 patent provides:

> 1. A method of detecting a fire condition in a monitored region including the following operations:
>
> (a) concurrently monitoring said region by a first sensor sensitive to radiation within a first band-width which includes the $CO_2$ emission band, by a second sensor sensitive to radiation within a second bandwidth which includes wavelengths mainly lower than the $CO_2$ emission band, and by a third sensor sensitive to radiation within a third band-width which includes wavelengths higher than the $CO_2$ emission band, wherein said third sensor senses radiation over a broad band which includes the two bands of said first and

[2] Spectronix asserts that the term "includes" means "contains or takes in at least a portion of," (Pl.'s '159 patent br. at 9), and that term "$CO_2$ emission band" means a portion of the infrared spectral region in which carbon dioxide radiation emissions are detectable, generally ranging from 4.3 - 4.7 $\mu$m. Detector claims that the term "includes" means "the third sensor senses all of the bands of the other two," (Def.'s '159 patent br. at 2), and that the that the construction of the term "$CO_2$ emission band" is therefore unnecessary.

> second sensors, and producing a first, second and third measurements of radiation variation emitted from said monitored region....

Neither the claim language nor the specification defines the term "includes." The court therefore turns to the prosecution history for clarification. See Vitronics, 90 F.3d at 1582-89.

As originally filed, claim 1 of the '159 patent provided:

> 1. A method of detecting a fire condition in a monitored region including the following operations:
>
> (a) concurrently monitoring said region by a first sensor sensitive to radiation within a first bandwidth which includes the $CO_2$ emission band, by a second sensor sensitive to radiation within a second bandwidth which includes wavelengths mainly lower than the $CO_2$ emission band, and by a third sensor sensitive to the radiation within a third bandwidth which includes wavelengths higher than the $CO_2$ emission band, and producing first, second and third measurements of radiation variations emitted from said monitored region;

(Anderson Aff., Ex. 1, Prosecution History at 32-36.) Claim 5, as originally filed, stated as follows:

> 5. The method according to Claim 1, wherein said third sensor senses radiation over a broad band which includes the two bands of said first and second sensors.

(Id.) The difference between claims 1 and 5 as originally filed was that claim 1 did not require that the third band encompass the wavelengths of the other two bands.

The patent examiner held that only claims 5 and 6 were allowable and only if those claims were rewritten in independent form, including all the limitations of the claims from which they depend. (Id. at 56.) The patent examiner stated:

> 2. The following is an Examiner's statement of reasons for indication of allowable subject matter: No reference, including Goto, et al. (US 5,153,563), suggests the provision of a broad band <u>including the other bands</u> and wavelengths higher than the $CO_2$ emission band.

(<u>Id.</u> (emphasis added).) Spectronix therefore rewrote claim 1 to include all the limitations of claim 5. Spectronix also cancelled original claims 5, 19 and 20 of the application. Thus, all claims depended upon claim 1, either directly or indirectly and each claim included the limitations as set forth in the original claims 1 and 5.

Amended claim 1, which is the claim that issued as claim 1, is identical to claim 5 written in independent form.[3] It follows that the only reason the patent examiner permitted claim 1 was because claim 1 contained two required limitations: (1) that the third sensor is sensitive to wavelengths above the $CO_2$ emission band and (2) that the third sensor is sensitive to "a broad band" that encompasses <u>all</u> of the other two bands. Thus, similar to the original claim 5, the term "includes" in the phrase "wherein said

---

[3] Spectronix admitted that claim 1 includes the limitations of claim 5, as originally filed. Spectronix made the following statement in support of amended claim 1:

> The Examiner has objected to claims 5 and 6 as being based on a rejected claim (claim 1). The Examiner has noted that claims 5 and 6 would be allowable if rewritten in independent form including all the limitations of the base claim and any intervening claim.
>
> <u>Claim 1, from which claim 5 directly depends, has now been amended so as [to] include the limitation of claim 5, which as now been canceled.</u>

(<u>Id.</u> at 66-67 (emphasis added).)

third sensor senses radiation over a broad band which includes the two bands of said first and second sensors," (Anderson Aff., Ex. '159, col. 7, ll. 1-3), means that "the third sensor senses all of the bands of the other two."

**B. '775 Patent**

The parties dispute whether several phrases included in the '775 are means-plus-function clauses.[4] Whether a claim limitation is in means-plus-function format is a matter of claim construction and is thus a question of law. See Kemco Sales, Inc. v. Control Papers Co., Inc., 208 F.3d 1352, 1360 (Fed. Cir. 2000). Title 35 § 112, ¶ 6 provides that a patentee may define the structure for performing a particular function generically through the use of a means expression, provided however that it discloses specific structure corresponding to that means in the patent specification.[5]

---

[4] The parties disagree about which phrases in the '775 patent require construction. Detector appears to believe that the court should define each claim limitation in the '775 patent. However, Spectronix claims that only certain phrases require construction and that the remaining phrases have "their respective ordinary meanings...." (Pl.'s '598, '156, and '775 br. at 2.) Given Spectronix apparent concession that most of the terms have their ordinary meaning, the court only construes those claims that Spectronix believes to be in dispute. The remaining claims have their ordinary meanings.

[5] Section 112, ¶ 6 specifically provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and

(continued...)

35 U.S.C. § 112, ¶ 6; see also Valmont Indus., Inc. v. Reinke Mfg. Co., Inc., 983 F.2d 1039, 1042 (Fed. Cir. 1993) (explaining that the patent applicant must describe in the specification some structure which performs the specified function recited in the claim limitation). The Federal Circuit has referred to § 112, ¶ 6 as embodying a statutory "quid pro quo" since the duty to link or associate structure to function is exchanged for the convenience of utilizing § 112, ¶ 6. See Kemco, 208 F.3d at 1360; B. Braun Medical, Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997).

Once a court establishes that a means-plus-function limitation is at issue, it must construe that limitation to determine what the claimed function is and what structure is disclosed in the written specification that corresponds to the "means" for performing that function. Kemco, 208 F.3d at 1360; Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308 (Fed. Cir. 1998) (explaining that, after establishing that a means-plus-function limitation is at issue, the district court must construe the function recited and determine what structure has been disclosed in the specification that corresponds for performing that function); Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1264 (Fed. Cir. 1999) (stating that claim limitations written as means-plus-

---

[5] (...continued)
equivalents thereof.
35 U.S.C.A. § 112 (West 2001).

function limitations pursuant to 35 U.S.C. § 112, ¶ 6 must be construed to cover the structure described in the patent specification for accomplishing the recited function and any equivalents thereof). A court, however, may not import functional limitations that are not recited in the claim or structural limitations from the written description that are unnecessary to perform the claimed function. Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001).

Use of the term "means" in a claim limitation creates a presumption that § 112, ¶ 6 has been invoked, but that presumption may be rebutted if the properly construed claim limitation itself recites a sufficiently definite structure to perform the claimed function. See Kemco, 208 F.3d at 1361. Conversely, absence of the word "means" creates a presumption that § 112, ¶ 6 has not been invoked, but that presumption may likewise be rebutted if the claim limitation is determined not to recite a sufficiently definite structure to perform the claimed function. See id. The court now evaluates those disputed claim terms in the '775 patent that may require a means-plus-function analysis.

**1. Independent Claim 1 of the '775 Patent**

Claim 1 of the '775 Patent provides:

> 1. A fire sensor system comprising: at least one detector means for detecting electromagnetic energy and generating a detector signal responsive to the amplitude of the detected energy; microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in

> the particular detector signal amplifier means disposed to between each detector means and the microprocessor means; and wherein the microprocessor means further includes means for controlling the gain of each amplifier and means for stimulating each detector with at least one test stimulus.

The court considers each of the disputed terms in claim 1 in turn.

**a. "Detector Means"**

The parties dispute whether the term "detector means" in claim 1 requires a means-plus-function analysis.[6] While the court recognizes that the word "means" raises the presumption that the phrase "detector means" is a means-plus-function clause, the structural modifying term "detector" provides the necessary structure to rebut the presumption of a means-plus-function format. See Kemco, 208 F.3d at 1361. Moreover, although the specification discloses two structures that may be used as a detector (see Anderson Aff., Ex. '775, col. 1, l. 66 - col. 2, l. 2), the court cannot read such a limitation into the claim language where none exists. Wenger, 239 F.3d at 1233. The court therefore construes the phrase "at least one detector means for detecting electromagnetic energy and generating a detector signal responsive to the amplitude of the detected energy" to refer to a detector and means for generating a signal in response to the amplitude of the energy detected.

---

[6] Spectronix claims that the term invokes the presumption that the claim is subject to the means-plus-function requirements of 35 U.S.C. § 112, ¶ 6, (Pl.'s '598, '156 and '775 Patent Br. at 5), while Detector argues that the presumption has been rebutted, (Def.'s '598, '775 and '156 Patent Br. at 5).

**b. "Microprocessor Means"**

The parties also dispute whether the phrase "microprocessor means" is a means-plus-function clause. Similar to the term "detector means," the court determines that the clause "microprocessor means" of claim 1 is not a means-plus-function clause. Despite use of the word "means," the structural modifying term "microprocessor" provides the necessary structure to rebut the presumption of a means-plus-function format. See Kemco, 208 F.3d at 1361. Moreover, the disclosures made in the specification cannot limit the claim's scope. See, e.g., Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("However, claims are not to be interpreted by adding limitations appearing only in the specification."). Therefore, the term "microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in the particular detector signal" refers to a microprocessor that analyzes signals and generates an output that is dependent upon the particular predetermined patterns utilized.

**c. "Predetermined Pattern"**

The parties also dispute the meaning of the phrase "predetermined pattern."[7] The court concludes that the phrase does

---

[7] As stated, Detector defines the phrase "microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in the particular detector signal" as a microprocessor that analyzes the signals and generates an output that is dependent upon the particular (continued...)

not require a means-plus-function format because the phrase does not lack sufficient structure to warrant construction under the means-plus-function analysis. Moreover, no language signals that ¶ 112, ¶ 6 should apply.

The parties present no intrinsic evidence supporting an ordinary interpretation and construction of the term. The court therefore considers extrinsic evidence. Markman, 52 F.3d at 980. Spectronix's expert witness explains that the ordinary meaning of "predetermined pattern" is "a predetermined temporal variation of the signal that would be indicative of a baseline fire."[8] (Chadwick Aff, Ex. C, ¶ 6.) Thus, based upon the limited briefing the parties have devoted to construing the term "predetermined pattern," and upon a review of the extrinsic evidence, the court finds that the term has its ordinary meaning of a predetermined temporal variation of the signal that would be indicative of a baseline fire. (See Chadwick Decl., Ex. C, ¶ 6.)

---

[7](...continued)
predetermined patterns utilized. Detector, however, does not define the specific term "predetermined pattern." (Def.'s '775, and '156 Patent Br. at 5.) Spectronix claims that one skilled in the art would define the term to mean "a predetermined temporal variation of the signal that would be indicative of a baseline fire." (Pl.'s '598, '156, '775 Patent Br. at 6.) In its reply memorandum, Detector asserts that Spectronix tries to apply a means-plus-function limitation to "predetermined pattern" when that term does not even use the word "means," but does not appear to disagree with Spectronix that the term should be given its ordinary and accustomed meaning.

[8] Detector presents no extrinsic evidence to construe the term. The court therefore relies upon Spectronix's expert declaration.

**d. "Means for controlling the gain of each amplifier"**

Spectronix applies the means-plus-function format to the phrase "means for controlling the gain of each amplifier" and argues that the term requires "a CPU programmed to reduce gain when an amplified detector signal exceeds the microprocessor input signal range and compensate for the reduction by application of a scale factor." Detector, however, construes the phrase "wherein the microprocessor means further includes means for controlling the gain of each amplifier and means for stimulating each detector with at least one test stimulus" to require that "the microprocessor includes a gain control and a test circuit." (Def.'s '775 and '156 Patent Br. at 5.) Detector impliedly concedes that the means-plus-function format applies, but argues that it makes little difference to the construction of the term. (Def.'s '598, '775 and '156 Patent Br. at 5-6.)

After a careful review of the record, the court concludes that the phrase "means for controlling the gain of each amplifier" is a means-plus-function clause. That phrase clearly recites a function for controlling the gain of each amplifier. Since the claim language does not provide for a corresponding structure for the "means," the court must turn to the patent specification for a description of the additional structure needed to accomplish the function of controlling the gain of each amplifier. 35 U.S.C. § 112, ¶ 6. The specification discloses the concept of controlling

gain as a CPU programmed to reduce gain when the amplified detector signal exceeds the microprocessor input signal range and compensates for the reduction by application of a scale factor. (Anderson Aff., Ex. '775, col. 2, l. 61 - col. 3, l. 2.) The court therefore construes the term "means for controlling the gain of each amplifier" as such.

**e. "Means for stimulating each detector"**

Spectronix also argues that term "means for stimulating each detector" requires means-plus-function analysis. Detector disagrees, but explains that even if the court were to apply a means-plus-function analysis, the element's meaning would change little. Detector does not define that specific term, but, as discussed, claims the phrase "wherein the microprocessor means further includes means for controlling the gain of each amplifier and means for stimulating each detector with at least one test stimulus" requires that the microprocessor includes a gain control and a test circuit. (Def.'s '775 and '156 Patent Br. at 5.)

Similar to the term "means for controlling the gain of each amplifier," the court concludes that the term "means for stimulating each detector" is a means-plus-function clause. That element clearly recites a function for stimulating each detector. Because the claim language does not provide for a corresponding structure for the "means," the court must turn to the patent specification for a description of the structure needed to accomplish the stated function. 35 U.S.C. § 112, ¶ 6. The

specification discloses the concept of stimulating each detector using a computer program resident in the CPU. (Anderson Aff., Ex. '775, col. 3, ll. 3-23.) It provides:

> The CPU 35 can also be programmed to check itself periodically. The CPU 35 will command the output demultiplexer 39 to stimulate the detectors 12 and 22 with various test conditions via feedback lines 54 and 56. If the signals coming back to the CPU 35 are of the proper amplitude and timing, and the self-check routine indicates that the CPU 35 has itself followed the appropriate steps in processing the data, an output will be generated and sent to an indicator on the display panel 40 to indicate that all is well. If something is found to be wrong during the test routine, the CPU 35 can be commanded to perform a diagnostic test routine from a service port 44 to isolate the faulty component. The self-check routine may be applied automatically and periodically by the CPU 35. The automatic check program would have to include a provision that the check routine would not be initiated if the signal from either amplifier 14 or amplifier 24 were greater than a predetermined value, so that a check routine would not be initiated just as a real fire was developing. (Id.)

Based upon the clear language in the specification, the court therefore construes the term "means for stimulating each detector" to require a CPU programmed to command an output demultiplexer to stimulate each detector with at least one test stimuli via a feedback line to periodically and automatically perform a self-check routine by simulating a fire condition, which program includes a provision to prevent its initiation as a real fire is developing.

**2. Claim 4: "Diagnostic means, within the microprocessor means, for performing a diagnostic check routine"**

Claim 4 provides:

> 4. The fire sensor system of claim 1 further comprising diagnostic means, within the microprocessor means, for performing a diagnostic check routine.

(Anderson Aff., Ex. '755, col. 4, ll. 1-3.) Spectronix claims that the term "diagnostic means" is a means-plus-function clause. Detector disagrees and explains that the term requires that the microprocessor is capable of performing a diagnostic check. The court concludes that the phrase "diagnostic means, within the microprocessor means, for performing a diagnostic check routine" is not in a means-plus-function format. Despite use of the word "means" in the term "diagnostic means," the structural modifying phrase "within the microprocessor means" and the term "diagnostic" provide the necessary structure to rebut the presumption of means-plus-function format. See Kemco, 208 F.3d at 1361. The court construes the phrase to mean that the microprocessor is capable of performing a diagnostic check.

**3. Claim 8**

Claim 8 of the '775 patent requires:

> 8. A system for selectively releasing a fire suppressant, said system comprising: a selectively releasable source of fire suppressant; first detector means for generating an output signal in response to detected electromagnetic energy associated with fire-related conditions; microprocessor means for operating on data applied to its inputs and generating commands in response thereto at its outputs, said microprocessor

> means including a central processing unit (CPU) and a programmable random access memory; first coupling means for coupling the first detector means to an input of the microprocessor means; second coupling means for coupling an output of the microprocessor means to the source of fire suppressant; and said memory having a program stored therein for causing said CPU to analyze the output signal from the first detector means and generate a command to said source causing said fire suppressant to be released when the detector signal exhibits preprogrammed characteristics indicative of serious fire.

(Anderson Aff., Ex. '775, col. 4, ll. 7-36.) The court analyzes the relevant terms in Claim 8 in turn.

**a. "Selectively Releasable Source of Fire Suppressant"**

The parties agree that the term "selectively releasable source of fire suppressant" (id. at l. 17) is a source of fire suppressant that is selectively released. (Pl.'s '598, '156 and '775 Patent Br. at 8; Def.'s '775 and '156 Patent Br. at 8.) The court therefore construes the term as such.

**b. "Fire Suppressant"**

The parties also appear to agree that the ordinary meaning of the term "fire suppressant" applies. (See Def.'s '598, '775 and '156 Patent Br. at 7; Pl.'s '598, '775 and '156 Patent Br. at 9.) The American Heritage Dictionary defines suppress as "to reduce the incidence or severity of." The American Heritage Dictionary, 2nd College Ed. at 1222 (1985). As such the court adopts the ordinary meaning of the term "fire suppressant," construing the term to mean a physical agent that tends to suppress or reduce the intensity of fire.

**c. "First Coupling Means"**

Spectronix appears to suggest that the phrase "first coupling means" in the clause "first coupling means for coupling the first detector means to an input of the microprocessor means" requires a means-plus-function format, (Pl.'s '598, '156 and '775 Patent Br. at 9), while Detector contends that the phrase contains sufficient structure to overcome the means-plus-function presumption (Def.'s '598, '775 and '156 Patent Br. at 5). The court agrees with Detector that the words "detector" and "microprocessor" provide the necessary structural modifying terms to rebut the means-plus-function presumption. See Kemco, 208 F.3d at 1361. Accordingly, the court construes the phrase "first coupling means for coupling the first detector means to an input of the microprocessor means" to require a first coupling that couples the first detector input of the microprocessor.

**d. "Second Coupling Means"**

The parties make similar arguments with respect to the term "second coupling means" in the phrase "second coupling means for coupling an output of the microprocessor means to the source of fire suppressant." The court again agrees with Detector that the word "microprocessor" provides the necessary structural modifying term to rebut the means-plus-function presumption. See Kemco, 208

F.3d at 1361. Accordingly, the court construes the phrase to require a second coupling that couples an output of the microprocessor to a source of the fire suppressant.

**e. "Preprogrammed characteristics indicative of a serious fire"**

The term "preprogrammed characteristics indicative of a serious fire" appears in the clause "said memory having a program stored therein for causing said CPU to analyze the output signal from the first detector means and generate a command to said source causing said fire suppressant to be released when the detector signal exhibits preprogrammed characteristics indicative of serious fire." (Anderson Aff., Ex. '775, col. 4, ll. 31-36.) The term does not require a means-plus-function format. Instead, it has its ordinary meaning. The court interprets that clause to require that the memory includes a program that causes the CPU to analyze output from the first detector and generate a command for the release of fire suppressant when preprogrammed characteristics indicate a fire.

**C. The '156 Patent**

The court construes those terms in the '156 patent that appear to be disputed and the finds that the remaining terms have their ordinary and accustomed meanings.

**1. "First Detector" and "Second Detector"**

Claim 1 of the '156 patent requires:

1. A microprocessor controlled fire sensor system

> comprising: a first detector for generating electrical signals in response to incident radiation within a predetermined first spectral band; a second detector for generating electrical signals from incident radiation within a predetermined second spectral band....

(Anderson Aff., Ex. '156, col. 8, ll. 32-39.) The claim language does not define "first detector" or "second detector." The court therefore looks to the specification for clarification. Vitronics Corp., 90 F.3d at 1582-89.

The specification discusses the first and second detectors as follows:

> Typically, a first detector 12 is capable of sensing only radiation having a wavelength of from 0.7 microns to 2.0 microns, and a second detector 22 is capable of sensing radiation in the 5 to 30 micron spectral region.

(Anderson Aff., Ex. '156, col. 2, ll. 26-30.) However, as Spectronix correctly points out, it is improper to import limitations from the specification to the claim language. Electro Medical Sys., 34 F.3d at 1054. Moreover, use of the word "typically" in the specification shows that the specification does not require those limitations to be attributed to the first and second detectors. Because the terms "first detector" and "second detector" are not written in a means-plus-function format, the specification's discussion of those terms cannot limit the claim language.

The court therefore concludes that (1) the element "a first detector for generating electrical signals in response to incident radiation within a predetermined first spectral band" means a first

detector generates electrical signals in response to radiation within a certain spectral range and (2) the element "a second detector for generating electrical signals from incident radiation within a predetermined second spectral band" means a second detector generates electrical signals from radiation within another spectral range.

**2. "Means Within the Microprocessor"**

Claim 1 further requires:

> 1. A microprocessor controlled fire sensor system comprising:
>
> .... means within the microprocessor for comparing the received signals with at least one preselected threshold stored in the memory, with said means generating an output signal for initiating release of fire suppressant when at least one of the received signals exceeds said one preselected threshold.

(Anderson Aff., Ex. '156, col. 8, ll. 55-60.) Detector interprets that element of Claim 1 to require that the microprocessor compares the received signals with at least one pre-selected threshold stored in the memory and generates an output signal for initiating release of fire suppressant when at least one of the received signals exceeds the pre-selected threshold. Detector offers no intrinsic or extrinsic evidence to support its construction. Spectronix requests that the court apply the means-plus-function analysis to the term "means within the microprocessor" and defines the term as the algorithm illustrated in Figure 3 of the '156 patent and denoted in its brief as steps 3-7 and 11. (Pl.'s '598,

'156 and '775 Patent Br. at 12-13.) Detector does not rebut Spectronix's argument in its reply memorandum and the court finds Spectronix's analysis persuasive. The court concludes that the term "means within the microprocessor" is in a means-plus-function format and adopts Spectronix's construction of the term.

In a means-plus-function claim in which the disclosed structure is a microprocessor programmed to carry out an algorithm, the "means' is limited to the algorithm(s) illustrated in the specification. Int'l Game Tech. v. WMS Gaming, Inc. 184 F.3d 1339, 1348-49 (Fed. Cir. 1999). Here, the claim language discloses the function of comparing the received signals and generating an output signal. The specification discloses the concept of means within the microprocessor to compare signals to a threshold and generate an output signal to release fire suppressant as a computer program resident in the CPU. (Anderson Aff., Ex. '156, col. 4, ll. 55-58.) Figures 3C and 3D disclose the relevant steps for that function.[9]

---

[9] Spectronix explains the relevant steps in its brief based upon the exhibit D of the Chadwick declaration as follows:

> At decision diams (3, 5), the program compares the "received signals," designated as "T" (thermal signal) and "P" (photon signal), with the " [sic] preselected threshold, designated as "THR." Id., col. 5, lines 25 - 37. If the relevative values of the signals do not exceed the threshold, the program manipulates a parameter, designated as "INHIBIT" (4, 6), to block the generation of a fire pulse output, which would indicate a fire. If either of the "received signals" ("T" or "P") exceeds the threshold, the parameter is set to allow for generation of a fire pulse output (7, 11).

(continued...)

Thus, based upon the specification, the court defines the term "means within the microprocessor" as the algorithm illustrated in Figure 3 of the '156 patent and denoted in steps 3-7 and 11 of footnote 9.

### 3. "Preselected Threshold"

Claim 1 of the '156 patent also requires a "preselected threshold." (Anderson Aff., Ex. '156, col. 8, ll. 56-57.) The term "preselected threshold" is not in a means-plus-function format. The court finds that the ordinary and accustomed meaning of the term "preselected threshold" applies and construes that term to mean a threshold value that has been pre-selected and sorted in the memory of the computer and is able to determine the presence of a fire.

### 4. "Means Controllable by the Microprocessor (for testing the operating condition of the system at predetermined regular intervals)"

Claim 7 of the '156 patent depends from claim 1. Thus, claim 7 includes all the limitations of claim 1 plus the additional element set forth in claim 7. Claim 7 of the '156 patent reads as follows:

---

[9](...continued)
Of course, the claim is not limited to the exact disclosure of the flowchart but, rather, only the process described. The limitation is comparing the physical signals (represented by "T" and "P") to a threshold (represented by "THR") and allowing for generation of a fire pulse signal when a certain condition is met.

> 7. The system of claim 1 further including means controllable by the microprocessor for testing the operating condition of the system at predetermined regular intervals.

(Anderson Aff., Ex. '156, col. 9, ll. 24-27.) The court construes the disputed clause "means controllable by the microprocessor."

The disputed clause requires a means-plus-function analysis because the clause provides the function for testing the operating condition of the system at predetermined regular intervals by the microprocessor but does not provide the corresponding structure in the claim language. The specification clearly sets out the steps corresponding to the relevant function in claim 7: "Operation of the microprocessor 30 of Fig. 1 in accordance with programming to accomplish the function of the circuit of Fig. 2 is illustrated in the flow diagrams of FIGS. 3A-3D."[10] (Anderson Aff., Ex. '156, col.

---

[10] Spectronix further explains the relevant steps in its memorandum:

> The specification states, "[t]he flow chart shown includes a BITE sequence which generates a timer such that a BITE test is generated approximately every ½ hour." '156 Patent, col. 6, lines 39-41. The specification further states that variable "H" is representative of the contents of a memory register and "provides a 28 minute timing signal for the BITE test." <u>Id.</u>, col. 5, lines 42-43. Parameter "J" toggles between a value of 1 (when a BITE test cannot be initiated) and 0 (allowing a BITE test). <u>Id.</u>, col. 5, lines 44-45. The disclosed program steps are described below.
>
> "H" is assigned an initial value by the program (0). During each pass through the program, the value of "H" is recalculated by a predetermined amount to simulate the passage of time, much like a clock (13). "H" is compared to see whether it has a value greater than zero (16). If "H" is greater than 0, the program goes through another

(continued...)

4, ll. 55-58.) Thus, based upon the specification, the court defines the term "means controllable by the microprocessor" as the algorithm illustrated in Figure 3 of the '156 patent and denoted as steps 0 and 12-19 in footnote 10.

### 5. "Means for Inhibiting the Generation of A Fire Suppressant Release Signal"

Claim 8 requires "[t]he system of claim 7 further in including means for inhibiting the generation of a fire suppressant release signal during testing of the system." (Anderson Aff., Ex. '156, col. 9, ll. 27-30.) Detector interprets the clause "means for inhibiting the generation of a fire suppressant release signal" to require that a fire suppressant release signal is inhibited during testing of the system. Spectronix defines that clause as the algorithm illustrated in Figure 3 of the '156 patent and denoted as steps 8-10 in it's affidavit. Spectronix's analysis is correct.

The clause "means for inhibiting the generation of a fire suppressant release signal" requires a means-plus-function analysis. Claim 8 requires the function of inhibiting the

---

[10](...continued)
iteration and "H" is recalculated to simulate the passage of time and "J" is assigned a value of 1 (17). The specification further programs that once "H" is less than zero, the program waits for the next time that the second (F) counter counts up to 8192 (12, 14). If "F" is greater than zero, then "J" is assigned a value of 1 (15). Once "F" reaches a value of 0, a BITE signal is sent to the detectors to drive the test stimulus." [sic] Id., col. 6, lines 57-60. "J" is toggled to equal 0 (18), thereby enabling initiation of a BITE test (19). (Pl.'s '598, '156 and '775 Patent Br. at 14-15.)

generation of a fire suppressant release signal. Figure 3D provides the relevant steps for that function.[11] (Chadwick Decl., Ex. D.) Accordingly, the court defines the clause "means for inhibiting the generation of a fire suppressant release signal" as the algorithm illustrated in Figure 3 of the '156 patent and denoted as steps 8-10 in footnote 11.

### 6. "Means for Causing the Microprocessor to Perform A Self-Analysis"

Claim 9 requires: "The system of claim 7 further including means for causing the microprocessor to perform a self-analysis of microprocessor condition." (Anderson Aff., Ex. '156, col. 9, ll. 31-33.) Detector states that the clause "means for causing the microprocessor to perform a self-analysis" means that the microprocessor performs a self-analysis of microprocessor condition. Spectronix defines that clause as an external input device connected to the microprocessor that enables manual

---

[11] Spectronix explains those steps, relying upon it's Exhibit D:

> Decision diamonds (8, 10) depict the program inquiring whether the contents of a memory cell, designated as "K," indicates that a "BITE test is in progress." '156 Patent, col. 5, lines 46-48. The specifications states, "when K equals 1, it indicates that the BITE test is in progress." Id. Memory cell content "K" toggles between 0 and 1. To be in this particular loop of the program, one of the signals ("P" or "T") exceeds the threshold ("THR") because diamond (7) has been answered in the affirmative. Thus, a fire pulse signal will be released, as shown at diamond (11), and the program is ensuring that a fire pulse signal is not released during the testing of the system. (Pl.'s '598, '156 and '775 Patent Br. at 15.)

initiation of a test routine. Again, Spectronix's analysis is correct.

The clause "means for causing the microprocessor to perform a self-analysis" requires a means-plus-function analysis because it provides for the function of causing the microprocessor to perform a self-analysis but does not give the corresponding structure to accomplish the self-analysis. Pursuant to 35 U.S.C. § 112, ¶ 6, the court looks to the specification. The specification discloses the concept of means for causing the microprocessor to perform a self-analysis by providing a mechanism to allow a user to manually initiate a test of one of the senors rather than waiting for the periodic test. In particular, the specification provides:

> This display may be connected to the service port 44, if desired, such that an external input from the service port can be used to probe the sensor status by starting the BITE sequence, rather than waiting for up to ½ hour for the sensor to test itself.

(Anderson Aff., Ex. '156, col. 6, l. 66 - col. 7, l. 2.) Thus, based upon the specification, the court defines the clause "means for causing the microprocessor to perform a self-analysis" as an external input device connected to the microprocessor that enables manual initiation of a test routine.

**7. "Fire Suppressant"**

As the parties appear to agree, the term "fire suppressant" has the same definition in the '156 patent as it does in the '775 patent discussed above. (See Def.'s '598. '775 and '156 Patent Br. at 7; Pl.'s '598, '156 and '775 Patent Br. at 16.)

**D. The '598 Patent**

As with the '156 patent, the court construes those terms in the '598 patent that appear to be disputed and finds that the remaining terms have their ordinary and accustomed meanings.

**1. "Long Wavelength" and "Short Wavelength"**

Claim 1 also requires:

> 1. A cross-correlation circuit for fire sensing compromising:
>
> first and second parallel signal channels for responding to long wavelength and short wavelength radiation, respectively; . . .

(Anderson Aff., Ex. '598, col. 10, ll. 40-44.) The parties dispute the meaning of the terms "long wavelength" and "short wavelength." The court therefore construes those two terms.

The claim language clearly refers to "long wavelength and short wavelength radiation...." (Id. at line 43.) While the claim language does not define what is a "long" and a "short" wavelength, it is clear that the terms "long wavelength" and "short wavelength" are relative.

Those terms do not require a more narrow construction. Even though the long and short wavelengths are illustrated as being

specific ranges of wavelengths for each channel in the preferred embodiments, the claims are not limited to the preferred embodiments disclosed in the specification. Virginia Panel Corp. v. MAC Panel Corp., 133 F.2d 860, 866 (Fed. Cir. 1997)("[I]t is well settled that device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent.")

Moreover, the doctrine of claim differentiation dictates that the terms "long wavelength" and "short wavelength" are not so limited. "The doctrine embodies the common sense notion that ordinarily language of one claim should not be so interpreted as to make another claim, such as claim dependent on the first claim, identical in scope." Chisum on Patents § 18.03[6] (1999). Here, claim 6 requires "[t]he apparatus of claim 1 wherein the spectral response ranges of the first and second detectors are spaced from each other." Thus, under the doctrine of claim differentiation, it is clear that claim 1 is not limited to spectral ranges that are spaced from each other.

Therefore, the court interprets the element "first and second parallel signal channels for responding to long wavelength and short wavelength radiation, respectively," as two channels that simultaneously respond, with the first responding to shorter wavelengths and the second responding to longer wavelengths of radiation.

### 2. "Means Coupled to the Output of Said Multiplier Stage"

Claim 1 of the '598 patent requires, in part:

1. A cross-correlation circuit for fire sensing comprising:

> ... means coupled to the output of said multiplier stage for summing the sampled pair products in order to develop a cross-correlation function signal corresponding to said signals from said signal channels which is indicative of the detection by both of said detectors of radiation from a fire source.

(Anderson Aff., Ex. '598, col. 10, ll. 54 - 59.) Detector interprets that element to means summing the sampled pair products to develop a cross-correlation function signal by comparing signal polarity, first derivative, second derivative, signal ration or other signal purporting to determine whether both signal channels are responding to a single fire source. Spectronix defines the clause as "summer hardware that sums data as depicted by the circuit in Figure 1." In response to Spectronix's definition, Detector impliedly claims that the summer is not limited to hardware but also may include software.

The term requires a means-plus-function analysis because it discloses the function of "for summing the sampled pair products in order to develop a cross-correlation function signal corresponding to said signals from said signal channels which is indicative of the detection by both of said detectors of radiation from a fire source," but does not disclose a corresponding structure in the claim language. The specification discloses the concept of a means

coupled to the output of a multiplier stage to sum sampled pair products to develop a cross-correlation function signal in the context of a summer stage 32. (Anderson Aff., Ex. '598, col. 5, ll. 17-18 and Fig. 1.) Accordingly, the court defines the term "means coupled to the output of said multiplier stage" to mean a summer that sums data as depicted by the circuit in Figure 1.

**3. "Storage Means"**

Claim 2 of the '598 patent provides for:

> 2. The apparatus of claim 1 wherein the means coupled to the multiplier stage includes storage means for temporarily storing individual products of pairs of sampled signals and for delivering the stored products in the order in which the signal products are received from the multiplier stage.

(Anderson Aff., Ex. '598, col. 10, ll. 60 - 65.) The parties dispute whether the term "storage means for temporarily storing individual products of pairs of sampled signals" requires a means-plus-function format. The court concludes that the structural modifying term "storage" provides a definite structure and thus rebuts the presumption of means-plus-function format. See Kemco, 208 F.3d at 1361. The patent specifically discloses memory as the means to store data. Thus, the court concludes that the means coupled to the multiplier stage includes a memory storage for storing means for sequentially delivering the stored products for use in developing the cross-correlation.

**4. "First Detector" and "Second Detector"**

Claim 7 of the '598 patent reads, in part:

7. A cross-correlator fire sensor circuit comprising:

> a first detector adapted to generate an electrical signal in response to radiation of the first selected wavelength in a range above approximately 4.0 microns;
>
> a second detector adapted to generate an electrical signal in response to radiation of a second selected wavelength in a range below approximately 4.0 microns;...

(Anderson Aff., Ex. '598, col. 11, ll. 14 - 21.) While the parties dispute the meaning of the terms "first detector" and "second detector," the claim language is clear. The claim language unambiguously defines the term "first detector," stating that the first detector will not respond to a signal that is below approximately 4.0 microns, but will respond otherwise. (Id. at 15-17.) The claim language also clearly defines the term "second detector," stating that the second detector will not respond to a signal that is above approximately 4.0 microns, but will respond otherwise. (Id. at ll. 18-20.) The court therefore construes those two terms as such.

**5. "Means for Cross-Correlating Sampled Signals"**

Claim 7 also requires:

7. A cross-correlator fire sensor circuit comprising:

> ... means for cross-correlating sampled signals, by pairs, to develop a fire sense signal when the correlation between signal pairs exceeds a predetermined threshold level.

(Anderson Aff., Ex. '598, col. 11, ll. 27 - 30.) The parties dispute the interpretation of "means for cross-correlating sampled signals." Spectronix claims that the term requires a cross-correlation circuit as depicted in Figures 1 and 2. Detector claims that the term does not require a means-plus-function format and defines the term as a cross-correlator that develops a fire sense signaled only when the signal pairs exceed a predetermined fixed or variable threshold level.

The term "means for cross-correlating sampled signals" requires a means-plus-function format because it discloses the concept of a means for cross-correlating sampled signals by pairs without disclosing a corresponding structure. Pursuant to § 112, ¶ 6, the court therefore looks to the specification, which explains that the invention provides a true cross-correlation of two detector signals "by comparing signal polarity, first derivative, second derivative, signal ration and other signal properties to insure that both detector signals are responding to the same source." (Anderson Aff., Ex. '598, col. 11, ll. 27 - 30.) The court therefore construes the term "means for cross-correlating sampled signals" as a cross-correlator that develops a fire sense signal only when the signal pairs exceed a predetermined fixed or variable threshold level by comparing signal polarity, first derivative, second derivative, signal ration and other signal properties to insure that both detector signals are responding to the same source.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that:

1. The court construes the relevant terms of the '159 patent as follows:

a. The term "includes" in the phrase "wherein said third sensor senses radiation over a broad band which includes the two bands of said first and second sensors" requires that the third sensor senses all of the bands of the other two.

b. The term "$CO_2$ emission band" does not require construction.

2. The court construes the relevant terms of the '775 patent as follows:

a. The phrase "detector means" in the clause "at least one detector means for detecting electromagnetic energy and generating a detector signal responsive to the amplitude of the detected energy" requires a detector and means for generating a signal in response to the amplitude of the energy detected.

b. The phrase "microprocessor means" in the clause "microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in the particular detector signal" refers to a microprocessor that analyzes signals and

generates an output that is dependent upon the particular predetermined patterns utilized.

c. The phrase "predetermined pattern" in the clause "microprocessor means for analyzing each detector signal and generating an output signal in response to certain predetermined patterns in the particular detector signal" means a predetermined temporal variation of the signal that would be indicative of a baseline fire.

d. The phrase "means for controlling the gain of each amplifier" requires a means for controlling gain as a center processing unit ("CPU") programmed to reduce gain when the amplified detector signal exceeds the microprocessor input signal range and compensates for the reduction by application of a scale factor.

e. The phrase "means for stimulating each detector" refers to a CPU programmed to command an output demultiplexer to stimulate each detector with at least one test stimuli via a feedback line to periodically and automatically perform a self-check routine by simulating a fire condition, which program includes a provision to prevent its initiation as a real fire is developing.

f. The phrase "diagnostic means within the microprocessor means for performing a diagnostic check routine" requires that the microprocessor is capable of performing a diagnostic check.

g. The phrase "selectively releasable source of fire suppressant" requires a source of fire suppressant that is selectively released.

h. The phrase "fire suppressant" requires a physical agent that tends to suppress or reduce the intensity of fire.

i. The phrase "first coupling means" in the clause "first coupling means for coupling the first detector means to an input of the microprocessor means" requires a first coupling that couples the first detector input of the microprocessor.

j. The phrase "second coupling means" in the phrase "second coupling means for coupling an output of the microprocessor" requires a second coupling that couples an output of the microprocessor to a source of the fire suppressant.

k. The phrase "preprogrammed characteristics indicative of a serious fire" in the clause "said memory having a program stored therein for causing said CPU to analyze the output signal from the first detector means and generate a command to said source causing said fire suppressant to be released when the detector signal exhibits preprogrammed characteristics indicative of serious fire" requires that the memory include a program that causes the CPU to analyze output from the first

detector and generate a command for the release of fire suppressant when preprogrammed characteristics indicate a fire.

3. The court construes the relevant terms of the '156 patent as follows:

a. The phrase "first detector" in the clause "a first detector for generating electrical signals in response to incident radiation within a predetermined first spectral band" means that a first detector generates electrical signals in response to radiation within a certain spectral range.

b. The phrase "second detector" in the clause "a second detector for generating electrical signals from incident radiation within a predetermined second spectral band" means that a second detector generates electrical signals from radiation within another spectral region.

c. The phrase "means within the microprocessor" requires the algorithm illustrated in Figure 3 of the patent and denoted in footnote 9 as steps 3-7 and 11.

d. The phrase "preselected threshold" requires a threshold value that has been preselected and sorted in the memory of the computer and is able to determine the presence of a fire.

e. The phrase "means controllable by the microprocessor for testing the operating condition of the

system at predetermined regular intervals" requires the algorithm illustrated in Figure 3 of the patent and denoted as steps 0 and 12-19 in footnote 10.

f. The phrase "means for inhibiting the generation of a fire suppressant release signal" requires the algorithm illustrated in Figure 3 of the patent and denoted as steps 8-10 in footnote 11.

g. The phrase "means for causing the microprocessor to perform a self-analysis" requires an external input device connected to the microprocessor that enables manual initiation of a test routine.

h. The phrase "fire suppressant" requires a physical agent that tends to suppress or reduce the intensity of fire.

4. The court construes the relevant terms of the '598 patent as follows:

a. The phrases "long wavelength" and "short wavelength" in the clause "first and second parallel signal channels for responding to long wavelength and short wavelength radiation, respectively" require two channels that simultaneously respond, with the first responding to shorter wavelengths and the second responding to longer wavelengths of radiation.

b. The phrase "means coupled to the output of said multiplier stage" requires a summer that sums data as depicted by the circuit in Figure 1.

c. The phrase "storage means for temporarily storing individual products of pairs of sampled signals" requires a memory storage for use in developing the cross-correlation.

d. The phrase "first detector" requires that the first detector will not respond to a signal that is below approximately 4.0 microns, but will respond otherwise.

e. The phrase "second detector" requires that the second detector will not respond to a signal that is above approximately 4.0 microns, but will respond otherwise.

f. The phrase "means for cross-correlating sampled signals" requires a cross-correlator that develops a fire sense signal only when the signal pairs exceed a predetermined fixed or variable threshold level by comparing signal polarity, first derivative, second derivative, signal ration and other signal properties to insure that both detector signals are responding to the same source.

Dated: August 2, 2002

David S. Doty, Judge
United States District Court